UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AMGUARD INSURANCE COMPANY : | | CIVIL CASE NO. |
| Plaintiff, : | | 3:25-CV-946 (JCH) |
| : | | |
| v. : | | |
| : | | |
| TYRONE ELLIS AND SHAKYRA ELLIS : | | NOVEMBER 19, 2025 |
| Defendant. : | | |

**RULING ON MOTION TO DISMISS THE AMENDED COMPLAINT (DOC. NO. 22)**

**I.   INTRODUCTION**

The plaintiff, AmGuard Insurance Company ("AmGuard"), brings this suit against defendants, Tyrone Ellis and Shakyra Ellis ("Ellises"), alleging one count of Negligence and one count of Breach of Contract stemming from a fire.  See Amended Complaint ("Amd. Compl.") (Doc. No. 20).  Before the court is the Ellis's Motion to Dismiss.  See Motion to Dismiss Amended Complaint ("Mot. Dismiss") (Doc. No. 22).  AmGuard Opposes the Motion.  See Plaintiff's Response in Opposition to Defendants Motion to Dismiss ("Pltf's. Opp'n.") (Doc. No. 23).[1]

For the reasons stated below, the court grants the Motion to Dismiss (Doc. No. 22) stemming from the anti-subrogation doctrine.

**II.   BACKGROUND**

AmGuard is a corporation organized and existing under the laws of State of Nebraska with its principal place of business at 39 Public Square, Wilkes-Barre, PA 18703, and at all times was authorized to engage in the business of insurance in the State of Connecticut.  See Amd. Compl. at ¶ 1.  At all times relevant, AmGuard provided

---

[1] Document numbers 23 and 24 are identical Responses in Opposition to the Defendants' Motion to Dismiss.  This court, therefore, only utilized Doc. No. 23 in its Ruling.

property insurance under a policy issued to Michael Caldwell ("subrogor") in connection with his property and business operations at 860 Windsor Avenue, Windsor, CT 06095 ("subject property"). See Amd. Compl. at ¶ 2. The policy of insurance was in full force and effect at all times relevant hereto. Id. In the wake of the below incident, as a result of claims made on said policy, which were duly paid, AmGuard alleges it became subrogated to certain recovery rights and interests of the subrogor for monies paid, including the claims giving rise to this action. See Amd. Compl. at ¶ 3. The Ellises are adult individuals who resided at the above Connecticut address as tenants. See Amd. Compl. at ¶¶ 4,5. On or about March 1, 2025, a fire started at the subject property, causing substantial damage and loss to the property, as well as imposition of other expenses. See Amd. Compl. at ¶ 8. AmGuard alleges that Tyrone and Shakyra Ellis left their minor children unsupervised in the subject property and in possession of a lighter. See Amd. Compl. at ¶ 9. Further, AmGuard alleges that the unsupervised minor used the lighter to ignite combustible materials in the subject property, so the fire spread throughout. See Amd. Compl. at ¶ 10. The fire ultimately caused substantial damage to the property, as well as additional expenses; the result was significant harm in excess of $102,256.08. See Amd. Compl. at ¶ 11. Subrogor submitted claims to AmGuard pursuant to the applicable insurance policy, and AmGuard paid the claims, becoming subrogated to the recovery pursued in this action. See Amd. Compl. at ¶ 12.

### III.    LEGAL STANDARD

#### A. 12(b)(6) Standard

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." See Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a Complaint as true, and draws all reasonable inferences in the nonmovant's favor. See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020). However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678. In deciding a motion to dismiss under Rule 12(b)(6), a complaint is deemed to include writings and documents attached to the complaint, referenced in the complaint, or integral to the complaint. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

   B. Subject Matter Jurisdiction under 12(b)(1)

A Rule 12(b)(1) motion to dismiss based on lack of subject matter jurisdiction can be either a facial attack or a factual attack. A facial attack merely questions the sufficiency of the pleading. When a defendant raises a facial attack to subject matter jurisdiction, the court takes the allegations in the complaint as true and draws all inferences in favor of the non-movant. See 2 James Wm. Moore et al., Moore's Federal Practice § 12.30[4] (3d ed. 2001). When a court reviews a complaint under a factual attack for lack of subject matter jurisdiction, the court must determine whether the factual predicate for subject matter exists. Id.; United Transp. Unions 385 & 77 v.

Metro–North Commuter, 862 F.Supp. 55, 57 (S.D.N.Y. 1994). Therefore, there is no presumptive truthfulness to the facts alleged in the complaint, and the court may consider evidentiary matter presented in an affidavit or otherwise in addition to the complaint. Kamen v. AT & T Co., 791 F.2d 1006, 1011 (2d Cir. 1986).

## IV.  DISCUSSION

### A.  The Court has Subject Matter Jurisdiction

The Ellises argue that the court should dismiss the Complaint for lack of subject matter jurisdiction. See Mot. Dismiss at 5. Section 1332 of title 28 of the U.S. Code delineates the requirements for subject matter jurisdiction, namely that parties must be citizens of different states, and the amount of controversy exceeds $75,000.

AmGuard is a corporation. See Amd. Compl. at ¶ 1. "The federal diversity jurisdiction statute provides that 'a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business.' " See Hertz Corp. v. Friend, 559 U.S. 77, 80 (2010). AmGuard alleges incorporation in Nebraska and its principal place of business in Pennsylvania. See Amd. Compl. at ¶ 1. Therefore, AmGuard is a citizen of Nebraska and Pennsylvania.

The Ellises are individuals. See Mot. Dismiss at 7. An individual's citizenship, within the meaning of the diversity statute, is determined by his domicile. See Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 42 (2d Cir. 2000). The Ellises admit to being domiciled in Connecticut. See Mot. Dismiss at 7.

The Ellises argue that this court lacks subject matter jurisdiction due to the "subrogee" and "subrogor" relationship. They argue that Michael Caldwell, a citizen of Connecticut, may not have been made whole through the payment of AmGuard's deductible. See Mot. Dismiss at 6. AmGuard alleges that the subrogor submitted

4

claims and, because AmGuard paid the claims consistent with its terms, it has become subrogated to the recovery.  See Amd. Compl. at ¶ 12.  The Ellises rely on St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply, 409 F.3d 73 (2d Cir. 2005), to claim that there may be a question of true diversity jurisdiction.  See Amd. Compl. at ¶ 12.

However, the Ellises are incorrect.  The Ellises mistakenly quote only part of the St. Paul ruling and conflate who may be a party with who is actually a party in this lawsuit.  The Supreme Court states in the context of subrogation:

> If the subrogee has paid an entire loss suffered by the insured, it is the only real party in interest . . . If it has paid only part of the loss, both the insured and insurer (and other insurers, if any, who have also paid portions of the loss) have substantive rights against the tortfeasor which qualify them as real parties in interest.

St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply, 409 F.3d 73, 81 (2d Cir. 2005), citing United States v. Aetna Casualty & Surety Co., 338 U.S. 366 (1949).  The Second Circuit explains that, where the insurer has not fully compensated the insured for its loss, then either party may sue without the presence of the other.  See St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply, 409 F.3d at 81.

That is what is occurring in this case.  AmGuard, a real party in interest, sued the defendants, but the insured, Mr. Caldwell, has not.  In such circumstances, only AmGuard's citizenship matters for the purpose of subject matter jurisdiction: the insured is not a party to this suit.[2]

Thus, there is subject matter jurisdiction and diversity jurisdiction.  The Motion to Dismiss based on lack of diversity jurisdiction is denied.

---

[2] Amguard's insured party, Mr. Caldwell, is not a required party.  See St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply, 409 F.3d at 81.

B. Connecticut Anti-Subrogation Rule Applies Here as the Lease is General

As a default rule, Connecticut law provides, in the context between a landlord's insurer against a tenant, the landlord has no right of subrogation in absence of a specific agreement in the contract.  See Amica Mut. Ins. Co. v. Muldowney, 328 Conn. 428, 436 (2018).  The Connecticut Supreme Court in DiLullo v. Joseph asserted that the duplication of insurance is a severe economic waste, but specified that tenants and landlords are free to allocate their risks and coverages by specific agreements in their leases.  See DiLullo v. Joseph, 259 Conn. 847, 854 (2002) ("We think our law would be better served by having the default rule of law embody this policy against economic waste, and by leaving it to the specific agreement of the parties if they wish to have a different rule").  Additionally, the Court in DiLullo agreed that ordinary tenants would not expect such a relationship with the landlord's insurer.  Id. ("[N]either landlords nor tenants ordinarily expect that the landlord's insurer would be proceeding against the tenant, unless expert counseling to that effect had forwarded them . . . thus barring subrogation in such a case comports with the equities of most situations.").

The Court in DiLullo adopted the default rule for two reasons: (1) " 'strong public policy against economic waste, and (2) the likely lack of expectations regarding a tenant's obligation to subrogate his landlord's insurer' for any damage the tenant might cause to the leased property or to other properties in a multiunit building."  See Amica 328 Conn. 428 at 437.  In DiLullo, the Supreme Court of Connecticut "did not expressly spell out what the 'specific agreement' must consist of to overcome the application of the default rule."  Id. at 436-7.  Thus, the Amica Court examined the ambiguity in

6

situations that fall out of the "typical default situation" to satisfy the "specific agreement" requirement. Id.

In Amica, the parties expressly agreed to require the tenant to purchase separate insurance coverage for their negligence; thus, the economic waste concern was not implicated because the parties themselves were responsible for any potential economic waste they created by choosing duplicate insurance. Id. at 438. In both Amica and DiLullo, the Supreme Court of Connecticut acknowledged that "tenants often expect that they will be covered under any insurance policy purchased by the landlord for the leased property, and, thus, presumably will not be liable for damages beyond the value of their security deposit." See Amica 328 Conn. 428 at 438, citing DiLullo 259 Conn. 847 at 851-2. Thus, "neither landlord nor tenants ordinarily expect that the landlord's insurer would be proceeding against the tenant, unless expert counseling to that effect had forewarned them . . . . [The Court] determined that neither good policy nor fairness supported an action for equitable subrogation if the parties had not agreed to the tenant's responsibilities in advance." Id. at 439. Therefore, if the tenant specifically agrees in a lease to be responsible for his or her own negligence and to purchase insurance for this purpose, it is not a surprise if the landlord's insurer holds the tenant responsible for any claims the insurer pays out to the landlord for the tenant's negligence. Id. None of the specific agreement concerns from DiLullo exist when the "parties specifically have agreed about who should bear the risk of damage and who should obtain insurance." Id.

In Middlesex, the Connecticut Supreme Court applied the DiLullo standard to an agreement allocating tenant responsibility for negligence and for insurance coverage.

7

See, generally, Middlesex Mut. Assur. Co. v. Vaszil, 279 Conn. 28 (2006).  The decision in Middlesex involved a subrogation claim by a landlord's insurer against the tenant in a multiunit residential building, where the insurer claimed that the tenant was negligent by causing a fire that resulted in damage.  Id.  The lease in question did not contain the word subrogation or any provision specifically providing that the landlord's insurer had a right of subrogation against the tenant.  Id. at 31-32.  The lease limited the tenant's responsibility for damages to the amount of the security deposit and did not require the tenant to purchase insurance.  Id. at 37-38.  The Connecticut Supreme Court concluded that the parties' lease did not contain a specific agreement to satisfy DiLullo.  Id. at 39.

In Amica, analyzing the Middlesex decision, the Connecticut Supreme Court determined that the Court did not need a specific agreement regarding subrogation explicitly, but instead, the Court looked to whether the parties' agreement "had put the tenant on notice that he would be responsible for any damage he caused and that he should obtain insurance coverage for this purpose."  Amica, 328 Conn. 428 at 440. (emphasis added).  The Court emphasized that the Middlesex lease "provisions . . . obligating the tenant not to cause damage to the apartment and to be responsible for repairing any such [damage] . . . do not rise to a level creating an express agreement noticing and obligating the tenant to be responsible for the fire loss."  Id., quoting Middlesex, 279 Conn. 28 at 33 (emphasis in original).  The Middlesex Court determined that the lease did not remotely inform the tenant that he would be liable to their landlord's insurer for any casualty fire damages to the landlord's building.  Amica, 328 Conn. 428 at 441 ("[The lease] informs them neither of the need to insure only their apartment, nor of the need to obtain insurance in an amount to cover the value of the

8

entire multiunit apartment building"). The Amica Court determined that the "primary purpose of notifying a tenant of the potential for subrogation is to put the tenant on notice that (1) the tenant will not benefit from the landlord's insurance, if any, for harm caused by the tenant's own negligence, (2) the tenant will be held responsible for this harm, and (3) the tenant thus should obtain insurance." Id. Therefore, the Amica Court concluded that "an express agreement that the tenant will bear responsibility for his negligence and needs to obtain his own insurance to cover that responsibility is the kind of 'specific agreement' that will overcome DiLullo's presumption against subrogation." Id. at 442.

In Amica, the Court examined what would qualify for a specific agreement to allow for subrogation and where the parties allocated their risks and coverages.

> They agreed that the defendants would secure a $1 million personal liability and property damage policy for both the landlord's and the defendants' "mutual benefit." The lease also provided that, if the defendants breached any of their promises in the lease, they would "pay [the landlord] all lost rent and other damages or costs [the landlord] may incur because of [the defendants'] broken promises." This is in addition to the defendants' agreement to hold the landlord "harmless from any loss or claim arising out of or in connection with [the defendants'] use and occupancy of the dwelling and property, including court costs and reasonable attorney's fees." These provisions are sufficient to put the defendants on notice that, as tenants, they would be responsible for any damages and were required to purchase their own insurance policy, for the benefit of both themselves and the landlord, which covers any damages the defendants might cause. Under these circumstances, the defendants had no expectation that the landlord or his insurer would ultimately bear responsibility for the defendants' own negligence. We therefore conclude that the parties made a specific agreement sufficient to overcome the application of DiLullo's presumption against subrogation.

Id. at 442-443. The Court made a point of highlighting that the parties "agreed by contract that the tenants would secure a policy for the landlord's benefit." Id. at 443 (emphasis in original).

9

Turning to the case presented here, neither party disputes the general default rule in DiLullo regarding subrogation in Connecticut.  See Mot. Dismiss at 8; Pltf's. Opp'n. at 7.  The Ellises argue that the lease here is similar to the lease in Middlesex, which did not put the defendants on notice: there are no references regarding insurance coverage for the mutual benefit of landlord and tenants.  See Mot. Dismiss at 7-11.  The Ellises assert that AmGuard attached a lease agreement but made no allegations concerning the allocation of risks and insurance coverages among the landlord and tenants.  Id. at 11.  Further, the Ellises allege that the lease specifically states the "defendants were required only to carry renters' insurance for the tenants' protection and benefit, not the landlords or their mutual benefit, for 'liability and for damage to . . . [tenants'] personal property in the Dwelling."  Id. at 11-12, citing Lease Agreement, at ¶ 12 [Doc. 20-1].  The Ellises argue that this lease required the tenants to obtain insurance to protect only themselves in the event of a catastrophic loss of personal property and the contents of an apartment.  Id. at 12.  The Ellises claim that the landlord and defendants did not agree that the defendants would obtain insurance for the multi-family dwelling, nor obtain property insurance coverage at all, beyond their own personal property specifically in their unit.  Id.  The Ellises posit that this lease fails to put a tenant on notice of an insurer's right of subrogation or for the securement of insurance coverage beyond a loss in the individual tenant's apartment.  Id.  Further, the Ellises argue that there is no reference to any agreement requiring the securing of insurance coverage for mutual benefit.  Id.

In response, AmGuard argues that the lease agreement contracts out of the default rule.  See Pltf's. Opp'n. at 7.  First, AmGuard points to paragraph 12 which

10

states " 'You will carry your own policy of renters insurance for liability . . . .' See Lease Agreement, ECF No. 20-1, ¶ 12." Id. AmGuard argues that this statement would put any reasonable person on notice to contract out of the entire anti-subrogation rule. Id. Further, AmGuard argues this lease is similar to the Amica lease and, for support, points to the provision that states the "liability insurance requirement language contained in the Lease Agreement falls under the heading 'DAMAGE TO DWELLING.' ". Id. at 8.

AmGuard adds that the Ellises were put on notice for damage caused by their negligence by pointing to three specific paragraphs. First, Paragraph 5 states "You [i.e. Defendants] will not destroy or damage any part of the Dwelling or any of our . . . appliances in the Dwelling." Id. Second, "Paragraph 15 states 'you will repair any damage that was caused by yourself, or others, normal wear and tear excepted.' " Id. Third, "Paragraph 16 states "If you do not do any of the things you promise to do under this lease, you will pay us the amount that we pay to do the things that you did not do.' " Id. AmGuard argues that, pursuant to these paragraphs, "the tenant is not permitted to negligently damage the property and, if they do, they can either repair the property before the lease ends (as per Paragraph 15) or pay the landlord the cost to repair the property (as per Paragraph 16)." Id. at 8-9.

This court rejects AmGuard's arguments.

First, AmGuard's conclusion regarding what qualifies as an express agreement is misguided. As the Connecticut Supreme Court meticulously examined in Middlesex and Amica, a general "provision . . . obligating the tenant not to cause damage to the apartment and to be responsible for repairing any such [damage] . . . [does] not rise to a

level creating an express agreement noticing and obligating the tenant to be responsible for the fire loss." Amica at 440, quoting Middlesex, 279 Conn. 28 at 33 (emphasis added). In Amica, the Court explained in detail how the specific lease in that case clearly covered the parties' risks and allocations, including a $1 million dollar policy for both the tenant and landlord's mutual benefit. See, supra, at 9.

None of the requirements from Amica appear in this current lease. There is only a general prohibition on no damage to the dwelling; there is no clearly delineated risk and allocation in this lease, and there in no explicit mention nor even a vague allusion to an insurance policy for the mutual benefit.

Landlord and tenants can contract around a vast assortment of provisions, including explicit details regarding exactly which insurance policies a landlord requires a tenant to acquire before renting. See Middlesex, 279 Conn. 28 at 34. Landlords generally have tremendous power compared with tenants. See, generally, Anthony T. Kronman, Paternalism and the Law of Contracts, 92 Yale L.J. 763, 772 (1983); Ezra Rosser, Exploiting the Poor: Housing, Markets, and Vulnerability A Book Review of Matthew Desmond, Evicted: Poverty and Profit in the American City (Crown Publishers, New York, 2016), 126 Yale L.J. Forum 458, 469 (2017). The landlord in this case was free to contract however he chose, including specific delineations of insurance requirements which would have contracted away the general Connecticut default rule. Yet he did not.

None of the specific provisions to which AmGuard draws the court's attention provides support for AmGuard's argument that this lease contracted out of the anti-subrogation doctrine. First, paragraph 12 of the lease states " '[y]ou will carry your own

policy of renters insurance for liability' ". See Pltf's. Opp'n. at 7.  This clause merely provides that the tenant should obtain insurance to protect themselves in case of a loss to their personal property and contents of the unit.  There is nothing in this paragraph to suggest that the Ellises should obtain insurance coverage for contents beyond their personal property and unit, such as insurance coverage for the entire multifamily building.  There is nothing in this paragraph of the lease that puts the Ellises on notice "that the landlord's insurer has a right of subrogation for any loss benefits paid, it also neglects to put a tenant on notice that he or she should obtain insurance coverage for a catastrophic loss, in other words, a loss extending beyond the tenant's individual apartment."  See quoting Middlesex, 279 Conn. 28 at 38.

Second, paragraph 5 states "You [i.e. Defendants] will not destroy or damage any part of the Dwelling or any of our . . . appliances in the Dwelling." See Pltf's. Opp'n. at 8.  This provision is a simple prohibition to not damage the apartment.  It has nothing to do with allocation of risk or insurance coverage, nor does it even provide notice that the defendants would be responsible for a fire damaging beyond their unit.  It is a standard prohibition of destruction of the apartment and appliances.

Third, "Paragraph 15 states 'you will repair any damage that was caused by yourself, or others, normal wear and tear excepted.' " See Pltf's. Opp'n. at 8.  AmGuard posits that this statement puts the defendant on notice. Id.  Counsel misleadingly left out that this paragraph provides no support for their proposition: the cherry-picked quote is from a paragraph regarding removal of property at the end of a lease.  See Amd. Compl. at Exhibit A ¶ 15.  Because there is no indication the lease has ended, nor there

13

was any issue with removal of property, this paragraph provides no support for a notice argument by the plaintiffs.

Fourth, "Paragraph 16 states, '[i]f you do not do any of the things you promise to do under this lease, you will pay us the amount that we pay to do the things that you did not do.' " See Pltf's. Opp'n. at 8. Again, this statement comes under the heading "Default" and the entire subsection contains provisions about a defaulted lease, nothing about notice, subrogation, or insurance. See Amd. Compl. at Exhibit A ¶ 16. There were no facts regarding the lease ending, notice to defendants that the lease would end, nor whether the subrogor opted to repair the damage within a time pursuant to the lease rather than ending it. See Mot. Dismiss at 14. Paragraph 16 of the lease provides no support for the arguments by the plaintiffs.[3]

None of the cited provisions provide support for AmGuard's arguments on notice, subrogation, or insurance. This lease appears strikingly similar to the lease in Middlesex. There is no contractual language between the landlord and the tenant allowing for a subrogation action to be brought on the part of the landlord's insurer for a fire loss caused by the tenant. There are no specific lease provisions putting defendants on notice that they would be responsible for damages beyond their personal property, nor that they would be required to purchase property insurance for the benefit of themselves and the landlord. Therefore, this lease agreement does not qualify as an express agreement under Amica, Middlesex, and DiLullo.

---

[3] While this court appreciates zealous advocacy, cherry picking and miscategorization of two of the provisions of alleged support is troubling to the court. See generally Conn. R. Prof. Conduct 3.3(a)(1); Zelaya de Ceron v. Lynch, 648 F. App'x 78, 80 (2d Cir. 2016).

14

The Connecticut Supreme Court and Legislators have given tenants explicit protections regarding subrogation, insurance, and notice. It is not for this District Court to counteract the decisions of the legislature, absent a constitutional issue. Because this court has determined the lease does not meet the express agreement standard outlined above, <u>supra</u>, at 8-9, and thus will dismiss the Complaint, it will not address the negligent supervision defense.

## V.  CONCLUSION

For the reasons stated above, the Motion to Dismiss the Amended Complaint (Doc. No. 22) is granted.

**SO ORDERED.**

Dated at New Haven, Connecticut this 19th day of November 2025.

      /s/ Janet C. Hall
Janet C. Hall
United States District Judge